**Wilson J. PARFAIT**

v.

**JAHNCKE SERVICE, INC.**

Civ. A. No. 69–225.

United States District Court,
E. D. Louisiana.

July 21, 1972.

---

486

William J. Daly and Samuel C. Gainsburgh, Kierr, Gainsburgh & Benjamin, New Orleans, La., for plaintiff.

Christopher Tompkins and Leonard N. Bouzon, Deutsch, Kerrigan & Stiles, New Orleans, La., for defendant, Jahncke Service, Inc.

Walter F. Gemeinhardt, New Orleans, La., for third-party defendant, Yo-Ro Diesel Service, Inc.

John R. Peters, Jr. and Herschel E. Richard, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for third-party defendant, Travelers Indemnity Co.

M. N. Grossel-Rossi and Michael A. Britt, Leach, Grossel-Rossi & Paysse,

New Orleans, La., for third-party defendant, Home Indemnity Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK M. GORDON, District Judge:

On or about October 1, 1967, Wilson J. Parfait, a welder employed by Yo-Ro Diesel Service, Inc., was repairing a broken cylinder block on a diesel engine aboard the Diesel Dredge Manchac (hereinafter "The Manchac"), which was owned and operated by Jahncke Service, Inc. While he was working on the engine, Parfait slipped on the floor of the engine room causing serious injury to his back and neck.

As a result of this accident Parfait brought the instant action against Jahncke Service, Inc. (hereinafter referred to as "Jahncke"), based on the alleged unseaworthiness of The Manchac and the alleged negligence of Jahncke. Jahncke then filed a third party complaint against Parfait's employer, Yo-Ro Diesel Service, Inc. (hereinafter referred to as "Yo-Ro") seeking indemnification from Yo-Ro for any liability to Parfait that Jahncke might incur. Jahncke based its claim for indemnification from Yo-Ro on the theory that Yo-Ro had breached its implied warranty of workmanlike performance. Both Jahncke and Yo-Ro then filed third party demands against Yo-Ro's two insurers, Travelers Indemnity Company (hereinafter referred to as "Travelers") and Home Indemnity Company (hereinafter referred to as "Home"). The two insurance companies were made third parties so that any possible indemnification Yo-Ro owed to Jahncke would be covered by either or both insurance policies. Both insurance companies, however, contend that there is no coverage under their policies.

Prior to the trial of this matter the main action between Wilson Parfait and Jahncke was compromised, and trial only as to the third party actions was conducted before this Court. At the conclusion of the trial the parties were required to submit additional memoranda on the issues before the Court, which are: (i)

is Jahncke entitled to indemnification from Yo-Ro, (ii) is coverage provided for Yo-Ro's liability to Jahncke by Travelers' policy, (iii) is coverage provided for Yo-Ro's liability to Jahncke by Home's policy, and (iv) is the settlement between Parfait and Jahncke reasonable. The Court has decided the foregoing issues after consideration of the testimony and evidence presented at the trial, and the memoranda submitted by the parties.

### Indemnification

Upon discovering that the main pump engine aboard The Manchac was broken, Jahncke contracted with Yo-Ro to weld the broken part. Parfait, the working foreman for Yo-Ro, came aboard the vessel to inspect the broken pump engine and determine what equipment should be used to make the repair. After completing his inspection Parfait left the vessel to obtain the tools and equipment needed for performance of the repair job. About two hours later Parfait returned with his son, Wilson J. Parfait, Jr., who was employed by Yo-Ro as an apprentice welder and was to assist his father in the welding job. While Parfait was gone Jahncke's employees had dismantled part of the engine to enable Parfait to perform his repair work, and, in so doing, the Jahncke employees disconnected a fuel line from which fuel oil was allowed to drip and accumulate on a catwalk adjacent to the engine, creating a dangerous condition. The Jahncke employees were not aware that fuel oil had dripped and created a hazard. Parfait, while standing on the catwalk to work on the engine, noticed that fuel oil was dripping and that it had accumulated on the floor where he was working; however, he neither attempted to remove the oil nor did he request Jahncke's employees to clean it up.

After working for approximately two hours on the repair, Parfait reached a point where the weld had to cool before he could continue. He walked to the end of the catwalk and up a short ladder to the deck above and proceeded straight to

a wash stand a short distance away. After washing his hands he returned, in the same direction from which he had come, and headed for the ladder leading down to the catwalk. As he neared the ladder he slipped and fell, either as a result of fuel oil on the soles of his shoes that had been picked up while he worked on the catwalk where fuel oil had accumulated, or as a result of fuel oil tracked on the steel deck by his shoes when he walked toward the wash stand.

Jahncke employees were cleaning engine parts in cans of fuel oil on the deck where the wash stand was located at the time Parfait walked to and from the wash stand. This activity, however, was well away from Parfait's path between the ladder and the wash stand and did not in any way contribute to the accident.

■ The accumulated fuel oil on the catwalk of The Manchac was a hazardous condition which rendered the vessel unseaworthy, Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed. 2d 941 (1960), and that unseaworthiness was a proximate cause of the accident.

■ Yo-Ro, as a contractor aboard Jahncke's vessel, The Manchac, owed Jahncke, as owner of the vessel, a warranty of workmanlike performance. Whisenant v. Brewster-Bartle Offshore Company, 446 F.2d 394 (5th Cir. 1971).

The warranty of workmanlike performance was breached by Yo-Ro when it failed either to clean up the accumulated oil on the catwalk before its crew began working or to inform Jahncke personnel that its crew would not commence working until the accumulated oil was cleaned up. The Fifth Circuit in Burrage v. Flota Mercante Grancolombiana, 431 F.2d 1229 (5th Cir. 1970) stated:

> The notion of workmanlike performance certainly encompasses an obligation by the contractor to take notice of those deficiencies and hazards likely to give rise to damage to life, limb, or property and then take requisite action depending on the nature of the relationship of the parties and their contractual obligations, express or

implied, either to eliminate or minimize the hazard or to stop work until the situation is corrected. 431 F.2d at 1232.

In *Burrage, supra,* the court found that a stevedore had breached its warranty of workmanlike performance when its longshoremen who were assisting in the unloading of a ship noticed beans spilled on the wharf. The longshoremen knew this condition was unsafe, and yet they did nothing about it. Furthermore, the Court said that the spillage did not have to be excessive. The condition had rendered the vessel unseaworthy, and this was sufficient to compel a conclusion that workmanlike performance called for a stevedore to do something.

This Court must conclude that the Fifth Circuit's rationale and holding in *Burrage, supra,* is controlling. Yo-Ro breached its warranty of workmanlike performance when its working foreman, Wilson Parfait, after noticing the unseaworthy condition, the accumulated fuel oil on the catwalk, failed either to clean up the oil or to discontinue his repair work until it was removed by Jahncke's employees.

■ Yo-Ro argues that Jahncke's action for indemnification is precluded by certain conduct on its part; namely, the disconnection of the fuel line from which the fuel oil dripped. In Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958), the Supreme Court indicated that conduct on the part of the shipowner could preclude contractual indemnification. The Fifth Circuit in Waterman Steamship Corporation v. David, 353 F.2d 660 (5th Cir. 1965), stated that contract principles are to be applied by the trier of fact to determine what conduct on the part of the shipowner will preclude indemnity.

In the instant case, although the unseaworthy condition was caused by Jahncke, Yo-Ro did nothing to remedy the hazardous condition that it noticed was present. A similar situation was present in T. Smith & Son, Inc. v. Skibs A/S Hassel, 362 F.2d 745 (5th Cir. 1966),

wherein the court held that negligence of the shipowner did not preclude indemnification. The stevedore's employee was aware of the condition and did nothing to correct it. The Fifth Circuit in Southern Stevedoring & Contract Co. v. Hellenic Lines, Ltd., 388 F.2d 267, 271–272 (5th Cir. 1968), stated:

> [Shipowner's] conduct, to preclude indemnity, must be sufficient to bar the enforcement of the contract. * * * The vessel's unseaworthiness, although a proximate cause of the accident, is not in itself conduct necessarily sufficient to preclude recovery. * * * Without entering the thicket of primary and secondary, or active and passive negligence * * * the trier of fact must weigh the substantiality of the fault of the shipowner against the breach of warranty by the stevedore to determine whether the former's conduct is "sufficient to preclude indemnity." (citations omitted).

■ This Court, after weighing the substantiality of the fault of Jahncke against the breach of warranty by Yo-Ro, is of the opinion, under all of the circumstances, that any fault by Jahncke and unseaworthiness created thereby, would not have prevented Yo-Ro from performing its operations in a workmanlike manner. Accordingly, it is held that Jahncke is entitled to indemnification from Yo-Ro.

*The Travelers Indemnity Company Policy*

At the time of Parfait's accident a Commercial Automobile—General Liability Policy (hereinafter referred to as the "Travelers policy") numbered KDS–6741447 was in effect between the insured, Yo-Ro, and Travelers. Yo-Ro argues that the policy provides coverage for the indemnification sought by Jahncke. Travelers argues that either Exclusion (d) or Exclusion (h) of the Manufacturers' and Contractors' Liability Insurance Coverage part of the Travelers policy vitiates any coverage.

Whether either or both of these exclusions relieve Travelers of coverage is a close and difficult question. Hence, the Court will not only state its decision, but will delineate in some detail the novel issues which are involved in interpreting the Travelers policy.

Exclusion (d) of the Travelers policy is generally referred to as the watercraft exclusion. It provides, in part:

> This insurance does not apply:
>
> * * * * * *
>
> (d) To *bodily injury* . . . arising out of the ownership, maintenance, operation, use, loading or unloading of any watercraft, if the *bodily injury* . . . occurs away from premises owned by, rented to or controlled by the *named insured;* but this exclusion does not apply to liability assumed by the insured under an *incidental contract;*

It is conceded by the parties that the accident occurred away from premises owned by, rented to or controlled by Yo-Ro and that liability was not assumed by Yo-Ro under an incidental contract; however, the parties contest whether Yo-Ro was performing *maintenance* within the meaning of the term's use in the watercraft exclusion at the time of Parfait's injury.

■ It is left to the finder of fact to determine whether the activity that Yo-Ro was engaged aboard The Manchac was maintenance, and the Court finds that Yo-Ro, through its employees, was engaged in the repair of the main pump engine aboard The Manchac. This activity, however, did not constitute *maintenance* as the term is utilized in Exclusion (d) of the Travelers policy, but rather, the activity by Yo-Ro was in the form of simple repair work.

The leading case interpreting a watercraft exclusion is Grigsby v. Coastal Marine Service of Texas, Inc., 412 F.2d 1011 (5th Cir. 1969). In that case the Fifth Circuit considered a watercraft exclusion similar to the one contained in the Travelers policy and stated:

> [T]he policy is intended to exclude coverage when use or maintenance, loading or unloading of the vessel is

that of the Assured. And as between Underwriter and Assured, that depends on whose work was being done, what work was being done, and that adds up to the permissible conclusion of the Trial Judge that this was not here "maintenance of the barge by Welders." 412 F.2d at 1038.

*Grigsby* presented a factual situation in which a company known as "Coastal Marine" contracted with another company, "Welders," the insured, to supply a pump for the removal of water from the tanks of a barge which was being serviced by Coastal Marine. Coastal Marine was unsuccessful in its attempt to start the pump. A Welders employee came aboard the barge with two additional pumps and worked for approximately one hour until the accident happened.

Welders' insurer asserted that its policy did not provide any coverage for liability to Welders because of the watercraft exclusion contained therein. The court was compelled to find that Welders' employee at the time of the accident was engaged in ship repair work because of certain federal safety regulations. This finding on the part of the court, the insurer argued, also required the court to find that Welders was engaged in the "ownership, maintenance, operation, use, loading or unloading of" a vessel for which activity there was no coverage by virtue of the watercraft exclusion. In response the court stated:

> Many factors point in the other direction. While it is true that we have held that the work being done by Sonnier [Welders' employee] had the force of making his employer for that operation into one engaged in ship repairing so far as coverage of that Federal Act was concerned, this is a long way from holding that Welders was in fact or in law engaged in "maintenance" of the Barge. The "maintenance" was being performed by Coastal, and Welders' role was to supply the needed pumps. Additionally, if the literal reading were applied, it would exclude liability for damage to

the vessel simply because of its status as one then undergoing "maintenance, operation, use, loading or unloading." 412 F.2d at 1037.

Yo-Ro argues that its activity aboard The Manchac was analogous to the activity of Welders in *Grigsby*. While this is a very close question, and although there are distinctions between the role of Welders in *Grigsby* and the role of Yo-Ro in the instant case, this Court finds that the role of Yo-Ro here is closer to that of Welders than that of any of the other parties in *Grigsby*. It is true, for example, that in *Grigsby* Welders was found to be engaged in ship repair work because its activity came within the ambit of certain federal safety regulations. This Court feels, however, that even absent the federal safety regulations, had the court in *Grigsby* made the factual determination that Welders was engaged in ship repair work, the court would not have concluded that such isolated activity as that engaged in by Welders constituted "maintenance" as that term is used in the watercraft exclusion. Rather, this Court interprets *Grigsby* as requiring a finding of continuous or regular repair activity as a prerequisite to "maintenance" within the definition of the exclusion. The Fifth Circuit did, in fact, conclude that the continuous and regular activity of Coastal Marine in *Grigsby* constituted "maintenance."

In the instant case, the testimony of Willie Gordon, the Chief Engineer on The Manchac, establishes beyond doubt that the normal upkeep, repair and maintenance of The Manchac and its engine was performed by Jahncke personnel. Yo-Ro was called upon only when a repair required welding or turning the engine's crankshaft. Mr. Gordon could recall only three occasions when Yo-Ro had performed work on The Manchac. According to these facts, the activity of Yo-Ro here fits somewhere in between that of Coastal Marine and that of Welders in *Grigsby*, but this Court feels that it is more analogous to that of Welders. In *Grigsby* Coastal Marine had

a specific contract with Aiple Towing, the owner of the barge in *Grigsby*, to service all of Aiple's barges calling at the Olin Terminal. Yo-Ro had no written contract with Jahncke to perform any services whatsoever. Jahncke chose to perform its own maintenance of The Manchac. Yo-Ro only performed certain specialized repair work when requested to do so by Jahncke.

In reaching its conclusion that the activity of Yo-Ro was not maintenance under Exclusion (d) of the policy, this Court also has relied upon the doctrine of *noscitur a sociis*, a concept which requires that the meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it. First Nat. Bank & Trust Co. v. Lincoln Power Corp., 118 F. Supp. 340 (E.D.Okl.1953). See also, Jarecki v. G. D. Searle & Co., 367 U.S. 303, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961); Polaroid Corporation v. C.I.R., 278 F.2d 148 (1st Cir. 1960); Wong Kam Wo v. Dulles, 236 F.2d 622 (9th Cir. 1956); Geer v. Birmingham, 88 F.Supp. 189 (N.D.Iowa 1950). Generally the courts have used *noscitur a sociis* in the area of statutory construction, but the concept is equally applicable in the area of insurance contract construction. 1 Couch on Insurance § 15.70 (2d ed. 1959).

The words in Exclusion (d) which surround and are associated with the term "maintenance" are "ownership," "operation" and "use." Each of these words has a meaning that connotes a form of continuous activity. Thus, *noscitur a sociis* requires that "maintenance" should be interpreted in a similar manner, and, so interpreted, "maintenance" as used in Exclusion (d) means a more continuous activity than that engaged in by Yo-Ro.

As has been discussed, the Court has had difficulty in interpreting the watercraft exclusion of the Travelers policy. Just as the watercraft exclusion in *Grigsby* is "not altogether free from doubt," the watercraft exclusion in the Travelers policy is not altogether free of doubt. "There is some ambiguity.

There is a need for construction. At this late date, it is an affectation to cite cases as to what occurs in that situation with an insurance policy." 412 F.2d at 1037.

For the foregoing reasons, the Court concludes that Yo-Ro was not performing maintenance as contemplated by Exclusion (d) of the Travelers policy, and thus, Exclusion (d) does not relieve Travelers from coverage under its policy.

Travelers also denies coverage because of Exclusion (h) in the policy which states:

This insurance does not apply:

* * * * * *

(h) *to bodily injury* to any employee of the insured arising out of and in the course of his employment by the insured; but this exclusion does not apply to liability assumed by the insured under an *incidental contract;*

It is conceded by the parties that Parfait was an employee of Yo-Ro, that his injury was sustained while in the course of his employment, and that the contract between Yo-Ro and Jahncke was not an "incidental contract," as defined in the policy. Yo-Ro, however, argues that any liability that it has to Jahncke is contractual, and that Exclusion (h) operates only when an employee of Yo-Ro is suing Yo-Ro directly. Moreover, Yo-Ro urges that certain language in Exclusion (a) in the policy is intended to retain coverage for any liability Yo-Ro has to Jahncke that arises out of a breach of Yo-Ro's warranty of workmanlike performance which was owed to Jahncke. Exclusion (a) states that:

This insurance does not apply:

(a) to liability assumed by the *insured* under any contract or agreement except an *incidental contract;* but with respect to *bodily injury* or *property damage* occurring while work performed by the *named insured* is in progress, this exclusion does not apply to a warranty that such work will be done in a workmanlike manner.

493

Travelers, admitting that Exclusion (a) provides coverage for liability of Yo-Ro where Yo-Ro has breached its warranty of workmanlike performance resulting in a suit for indemnification under Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Corporation, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), as has been brought against Yo-Ro by Jahncke in this case, argues that the coverage for damages arising out of bodily injury retained in Exclusion (a) is restricted by Exclusion (h) to bodily injury to persons other than employees of Yo-Ro.

In support of its contention Yo-Ro cites Indemnity Insurance Company of North America v. California Stevedore & Ballast Company, et al., 307 F.2d 513 (9th Cir. 1962) wherein the Ninth Circuit (considered the insurer's contention that its policy did not provide coverage where an employee of a stevedore sued a shipowner and the shipowner subsequently sought indemnification from the stevedore. The policy there in question contained an Exclusion (c) which stated:

Exclusion (c)

This policy does not apply under coverage A, *except with respect to liability assumed under written contract,* to bodily injury to or sickness, disease or death of any employee of the insured while engaged in the employment of the insured, other than a domestic employee for whose injury benefits are not payable or required to be provided under any workmen's compensation law; or to any obligation for which the insured or any company as his insurer may be held liable under any workmen's compensation law; * * * (emphasis added)

The court there found there was coverage notwithstanding such exclusion. First, it held that Exclusion (c) was generally inapplicable since it related to workmen's compensation or employer's

liability, or both, neither of which was dealt with by the shipowner's case at bar. With regard to the issue pertinent to this case, the court simply stated, "We do not read Exclusion (c) as excluding anything having to do with appellees' [the stevedores'] contractual liability." 307 F.2d at 516. The court then concluded that even if Exclusion (c) were generally applicable, the insurance coverage still would exist since, as the court determined, the stevedores' liability to the shipowners had been assumed under written contracts.[1]

In the recent case of Larson Construction Co. v. Oregon Automobile Insurance Co., 450 F.2d 1193 (9th Cir. 1971), the Ninth Circuit considered in some detail the applicability of an exclusion from bodily injury coverage of bodily injury to an employee in the context of a comprehensive general liability policy, and amplified on its rationale of *Indemnity Insurance, supra.* The *Larson* case involved a situation where a barge loader's employee, injured while assisting in the loading of a barge, sued the barge owner, who claimed indemnification from the employer. Under its comprehensive general liability policy the employer's insurer was obligated "[t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of * * * BODILY INJURY," 450 F.2d at 1194. The policy in Exclusion (c), however, excluded coverage for "(c) * * * bodily injury of an employee of an insured arising out of and in the course of * * * (2) * * * employment by an insured * * *", 450 F.2d at 1194. The insurer denied liability on the basis of this exclusion. The court, however, stated:

We turn to exclusion (c). The word in the insuring clause, " * * * all sums which insured shall become

I. Exclusion (h) of the Travelers policy with Yo-Ro in the instant case states that the policy applies to "liability assumed by the insured under an *incidental contract,*" whereas the exclusion in *Indemnity Insurance, supra,* refers to "liability assumed under a written contract." The parties are in agreement that the contract of repair between Yo-Ro and Jahncke was not an "incidental contract" as defined by the policy.

legally obligated to pay as damages because of * * * BODILY INJURY * * * ", standing alone, and without reference to the exclusions, is broad enough to cover first, the liability to an employee because of injuries suffered by him and second, the liability to a third person which has its origin in bodily injuries suffered by the employee. The problem here arises because the exclusion does not refer to "* * * all sums which the insured shall become legally liable to pay as damages because of * * * BODILY INJURY LIABILITY," but simply makes the coverage inapplicable to " * * * bodily injury to any employee. * * * " As we see it, the language of the exclusion is somewhat narrower than the language of the insuring clause and while the meaning is not clear, the exclusion could be interpreted to refer to no more than the damages suffered by the employee himself. Because of workman's compensation and similar laws, the employee presents a special kind of risk ordinarily insured by a special policy devoted exclusively to that risk or in some cases by deposits ordered by the officers administering the workman's compensation or similar law. A person examining exclusion (c) might reasonably believe that it was intended to exclude only that special employee hazard normally covered by that special policy. In view of the special treatment of the employee hazard, the differences between the words used in the insuring and the exclusion clauses and the fact that the risk here was a known risk, we hold that the exclusion (c) was not spelled out in sufficient certainty to eliminate the coverage in this case.

The result which we reach is in accord with, although not compelled by, the decision in Indemnity Ins. Co. v. California Stevedore & Ballast Co., 307 F.2d 513 (9th Cir. 1962). In that case the Court relied upon the existence of a contract between the stevedore and shipowner and a clause in the policy assuming liability under written contracts. There is no contract here. *Notwithstanding, we hold that if the liability of the stevedore to the shipowner is not to be insured in a comprehensive liability policy then that risk should be excluded in unmistakable terms no matter what words may be used to rationalize the imposition of the stevedore's liability.* 450 F.2d at 1195–1196 (Emphasis supplied).

There is some difference in the Travelers policy before this Court and the policy in the *Larson* case which might arguably be used to distinguish *Larson.* The policy in *Larson, supra,* was a Comprehensive General Liability Policy whereas the instant Travelers policy is entitled Manufacturers' and Contractors' Liability Insurance. The wording of the general obligation of the insurer and Exclusion (h) in the instant policy are somewhat different from the wording employed in the policy in *Larson, supra.*

The opinion in *Larson, supra,* did not reproduce the policy in question in its entirety; therefore, it cannot be determined whether the policy in the *Larson* case may have had an exclusion similar to Exclusion (a) in the instant policy. Nevertheless, the presence of Exclusion (a) in Yo-Ro's insurance policy with Travelers reinforces the position that the Travelers policy provides coverage for Yo-Ro's liability to Jahncke.

It might be argued that a finding that the language of Exclusion (a) retaining coverage for liability arising out of breaches of warranty of workmanlike performance does provide coverage for Yo-Ro's liability would render Exclusion (h) in part meaningless. This Court is mindful that in considering an insurance policy it should interpret the policy so that all provisions of the policy are given a reasonable meaning and no portion is left inexplicable or useless. Jameson v. Mutual Life Insurance Company of New York, 415 F.2d 1017, 1020 (5th Cir. 1969). The Court is equally mindful, however, that where there is ambiguity in a policy of insurance, such ambiguity must be construed in favor of the insured. *Grigsby, supra,* 412 F.2d at 1037.

The conclusion, therefore, is inescapable that the Travelers policy does provide coverage for Yo-Ro's liability to Jahncke which resulted from Yo-Ro's breach of its warranty of workmanlike performance. Such a conclusion does not render Exclusion (h) meaningless, rather, Exclusion (h) would operate to deny coverage to Yo-Ro for any liability it` might have toward insured employees who are not covered by compensation or similar statute.[2] The exception in Exclusion (a) is clearly intended to provide coverage where Yo-Ro's liability arises as a result of a breach of its warranty of workmanlike performance. If Travelers intended to limit this coverage to bodily injury to persons other than employees of Yo-Ro, then it did not do so with sufficient clarity.

### Home Indemnity Company Policy

Home's policy is a workmen's compensation and employer's liability policy. The policy is intended to provide Yo-Ro with coverage when there is a compensation claim or when an employee has a claim that is not covered by a compensation Act. The policy covered claims under the Louisiana Workmen's Compensation and the Longshoremen's and Harbor Workers' Compensation Act. There was also $25,000 coverage under Employer's Liability.

The only maritime liability covered by the policy is under the Longshoremen's and Harbor Workers' Compensation Act; all other maritime liability is excluded by the following endorsement:

It is agreed that the policy does not apply to injury, including death resulting therefrom, sustained by a master or a member of the crew of any vessel or by any person in the course of an employment subject to the United States Longshoremen's and Harbor Workers' Compensation Act.

■ Wilson Parfait was injured while repairing a vessel on navigable waters, and is, thus, subject to the provisions of the Longshoremen's and Harbor Workers' Compensation Act. Calbeck v. Travelers Ins. Co., 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962). The policy provides coverage for a claim under the Longshoremen's and Harbor Workers' Act, but that is the limit of the policy's coverage for maritime injuries.

In Brickley v. Offshore Shipyard, Inc., 270 F.Supp. 985 (E.D.La.1967), the plaintiff was seeking recovery as a seaman or in the alternative, as a longshoreman. The defendant's insurance policy contained an exclusion which stated:

It is agreed that the policy does not apply to injury, including death resulting therefrom, sustained by:

(1) a master or a member of the crew of any vessel . . . . 270 F.Supp. 987.

The Court stated:

If the plaintiff here were a seaman, as he alleges in his complaint, we would feel bound to grant the motion for summary judgment for lack of coverage, since the very definition of seaman is "a member of the crew of any vessel." 270 F.Supp. at 987.

■ In Home's policy the exclusion of maritime liability has been extended to injuries sustained by persons subject to the Longshoremen's and Harbor Workers' Act, and, therefore, the Court must conclude that the policy does not provide coverage for Yo-Ro's liability to Jahncke arising out of the accident of the plaintiff Parfait.

### Reasonableness of the Settlement

■ The Court concludes that the settlement between Wilson Parfait and Jahncke was reasonable. Yo-Ro

---

**2.** The Ninth Circuit in *Larson, supra,* indicated that it was reasonable to assume that the exclusion before that court was intended to deny coverage for any liability the employer might have under a workmen's compensation statute. The instant Travelers policy, however, contains a specific exclusion [Exclusion (g)] dealing with liability under workmen's compensation statutes.

argues that it should not be required to accept the settlement because it did not participate in the settlement negotiations between Parfait and Jahncke. There is no merit to Yo-Ro's contention inasmuch as it was apprised of the progress of settlement negotiations (Jahncke's Exhibit 4) and felt that the negotiations were favorable to Yo-Ro (Jahncke's Exhibit 3). Parfait was suing Jahncke, and it was Jahncke's responsibility to seek settlement. A shipowner may settle the main demand with the injured longshoreman or harbor worker and proceed against the employer where the stevedore's acts caused the accident. Paliaga v. Luckenbach Steamship Company, 301 F.2d 403 (2nd Cir. 1962), and American Export Lines v. Norfolk Shipbuilding & Drydock Corporation, 336 F.2d 525 (4th Cir. 1964). In the cited cases there is no requirement that a shipowner include the employer in the settlement negotiations.

Travelers asserts that a finding by the Court of the cause of the accident is determinative of the reasonableness of the settlement. Travelers contends that if Parfait's injury resulted solely from oil on his shoes, then the settlement was unreasonable because Parfait was solely responsible for his injury; however, if the spillage of oil by Jahncke employees cleaning engine parts on the upper deck caused Parfait's accident, then the settlement was reasonable because Jahncke was responsible for the accident.

 The test of the reasonableness of the settlement is the potential liability of the shipowner. In California Stevedore & Ballast Co. v. Pan-Atlantic Steamship Corporation, 291 F.2d 252 (9th Cir. 1961), the Ninth Circuit refused to accept the stevedore's argument that the liability of the shipowner must be proved to have been an actual one. Rather, the court stated:

> [T]he indemnitee need show only a *potential* liability; the indemnitee need not resist settlement to the point of a jury verdict, the amount of which might greatly exceed a reasonable settlement. 291 F.2d at 254.

See also, Damanti v. A/S Inger, 314 F.2d 395, 397 (2nd Cir. 1963). Jahncke has shown that it faced a serious potential liability. Under either theory as to the source of the oil which caused Parfait to slip, Jahncke would face a serious potential liability from a claim of unseaworthiness by Parfait.

 The only question remaining is the reasonableness of the amount of the settlement. The suit was for $160,000 with evidence that Parfait had suffered a permanent disability as to heavy work. lost wages of $30,000, anticipated lost wages of $130,000, and two operations for the removal of ruptured disc material. Even assuming substantial contributory negligence on the part of Parfait, the settlement in the amount of $74,635.84 was reasonable.