484 F.2d 296
 Wilson J. PARFAIT, Plaintiff,
v.
JAHNCKE SERVICE, INC., Defendant-Third Party Plaintiff-Appellee,
Yo-Ro Diesel Service, Inc., Third Party Defendant-Fourth
Party Plaintiff-Appellee-Appellant,
Home Indemnity Company, Third Party Defendant-Appellee,
The Travelers Indemnity Company, Fourth Party Defendant-Appellant.
 No. 72-3316.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 31, 1973.
Rehearings Denied Oct. 3 and Oct. 24, 1973.
 
 John R. Peters, Jr., New Orleans, La., for Travelers Indemnity Co.
 Walter F. Gemeinhardt, New Orleans, La., Leonard N. Bouzon, New Orleans, La., for Yo-Ro Diesel Service.
 Christopher Tompkins, New Orleans, La., for Jahncke Service, Inc.
 Michael A. Britt, M. N. Grossel-Rossi, New Orleans, La., for Home Indemnity Co.
 William J. Daly, S. C. Gainsburgh, New Orleans, La., for Wilson J. Parfait.
 Before THORNBERRY, AINSWORTH and RONEY, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 
 1
 In this multiparty admiralty case we must determine whether the district court properly awarded a shipowner indemnity under the Ryan doctrine for amounts it paid in settlement of a claim against it and whether the district court correctly interpreted two insurance policies.
 
 
 2
 On October 1, 1967, Wilson Parfait, an employee of Yo-Ro Diesel Service, Inc., was injured while he was aboard a diesel dredge owned and operated by Jahncke Service, Inc. to repair a broken cylinder block of one of the vessel's engines. Parfait sued Jahncke to recover for his injuries, alleging negligence and unseaworthiness. Jahncke filed a third-party complaint against Yo-Ro for indemnity under the Ryan[1] doctrine. Jahncke and Yo-Ro both filed fourth-party actions against Yo-Ro's two insurers, Travelers Indemnity Company and Home Indemnity Company. Jahncke settled the original suit brought by Parfait, and the third- and fourth-party suits were tried to the Court. The district court awarded Jahncke indemnity from Yo-Ro, and held Yo-Ro's loss to be covered by the Travelers policy, but not by the Home policy. Travelers and Yo-Ro appeal, testing the strength of all links by which they are connected to the liability chain. Additionally, Yo-Ro seeks to forge a new protective link, arguing that the Home insurance policy, as well as the Travelers policy, should be construed to cover any loss which Yo-Ro may eventually suffer as a result of Parfait's injury. We affirm the district court's ruling that Jahncke is entitled to indemnity from Yo-Ro but reverse as to coverage under each insurance policy.
 
 
 3
 The district court summarized the facts relating to Parfait's injuries as follows:
 
 
 4
 Upon discovering that the main pump engine aboard The Manchac was broken, Jahncke contracted with Yo-Ro to weld the broken part. Parfait, the working foreman for Yo-Ro, came aboard the vessel to inspect the broken pump engine and determine what equipment should be used to make the repair. After completing his inspection, Parfait left the vessel to obtain the tools and equipment needed for performance of the repair job. About two hours later Parfait returned with his son, Wilson J. Parfait, Jr., who was employed by Yo-Ro as an apprentice welder and was to assist his father in the welding job. While Parfait was gone, Jahncke's employees had dismantled part of the engine to enable Parfait to perform his repair work, and, in doing so, the Jahncke employees disconnected a fuel line from which fuel oil was allowed to drip and accumulate on the catwalk adjacent to the engine, creating a dangerous condition. The Jahncke employees were not aware that fuel oil had dripped and created a hazard. Parfait, while standing on the catwalk to work on the engine, noticed that fuel oil was dripping and that it had accumulated on the floor where he was working; however, he neither attempted to remove the oil nor did he request Jahncke's employees to clean it up.
 
 
 5
 After working for approximately two hours on the repair, Parfait reached a point where the weld had to cool before he could continue. He walked to the end of the catwalk and up a short ladder to the deck above and proceeded straight to a wash stand a short distance away. After washing his hands he returned, in the same direction from which he had come, and headed for the ladder leading down to the catwalk. As he neared the ladder he slipped and fell, either as a result of fuel oil on the soles of his shoes that had been picked up while he worked on the catwalk where fuel oil had accumulated, or as a result of fuel oil tracked on the steel deck by his shoes when he walked toward the wash stand.
 
 
 6
 Parfait v. Jahncke Service, Inc., E.D. La.1972, 347 F.Supp. 485, 488-489. The fall caused serious injury to Parfait's neck and back.
 
 
 7
 As outlined above, Parfait sued Jahncke on theories of negligence and unseaworthiness, Jahncke impleaded Yo-Ro as the third-party defendant, and both Yo-Ro and Jahncke impleaded Yo-Ro's insurers as fourth-party defendants. In early January of 1972, counsel for Parfait offered to settle the $160,000 suit for $90,000. Upon receiving notice of the offer, counsel for Yo-Ro wrote Jahncke, Travelers, and Home indicating that he would regard as favorable a settlement in any amount within the $100,000 limit of Yo-Ro's general liability insurance policy with Travelers and called upon Travelers and Home to effect such a settlement immediately.[2] In reply counsel for Jahncke offered Yo-Ro the defense of the action in exchange for a hold-harmless agreement, and indicated he would attempt to settle the case along the lines indicated by Yo-Ro if Yo-Ro did not accept the offer to take over the defense.[3] In the absence of any further objection by Yo-Ro, Jahncke settled with Parfait for a total of $74,635.84 shortly before trial of Parfait's action was to begin. At trial of the third- and fourth-party claims Yo-Ro objected to the reasonableness of the settlement, and Travelers and Home denied coverage under their respective policies.
 
 
 8
 The district court found that the oil which had dripped on to the catwalk created an unseaworthy condition which was a proximate cause of the accident, and that, even assuming substantial contributory negligence on the part of Parfait, the settlement was reasonable in amount. The court held further that Yo-Ro had breached its duty to Jancke to perform its work in a workmanlike manner and that Jahncke was therefore entitled to indemnification from Yo-Ro for the sum it paid to satisfy its potential liability to Parfait. Finally, the district court construed the Travelers policy, but not the Home policy, as covering the indemnity expense incurred by Yo-Ro, so that the cost of the settlement ultimately fell on Travelers.
 
 I. Indemnity
 
 9
 We treat first the question whether the district court properly awarded Jahncke indemnity from Yo-Ro. To establish its entitlement to indemnity for the amount paid in settlement of Parfait's claim, Jahncke was required to show first that an indemnitor-indemnitee relationship existed between Yo-Ro and itself. If there was such a relationship, Jahncke had the additional burden of satisfying the district court that it, Jahncke, had acted in accordance with equitable indemnity principles in making the settlement and had not spent its indemnitor's money too freely.
 
 
 10
 Below Jahncke relied on the breach of warranty theory set forth in Ryan Stevedoring Company v. Pan-Atlantic Steamship Corporation, 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 to establish an indemnitor-indemnitee relationship. Under the Ryan doctrine stevedores and other shore-based contractors who go aboard a vessel by the owner's arrangement or by his consent to perform service for the ship's benefit impliedly warrant to the shipowner that they will accomplish their task in a workmanlike manner.[4] The essence of the contractor's warranty of workmanlike performance is to perform its work "properly and safely." Id. 350 U.S. at 133, 76 S.Ct. at 237. See also Whisenant v. Brewster-Bartle Offshore Company, 5th Cir. 1971, 446 F.2d 394, 399. The maritime contractor's warranty, just as a manufacturer's warranty against defective products, may be breached even when the contractor has not been negligent. Italia Societa v. Oregon Stevedoring Company, 1964, 376 U.S. 315, 84 S. Ct. 748, 11 L.Ed.2d 732. If the contractor breaches its warranty, and the breach proximately causes liability on the part of the shipowner, then the shipowner is entitled to indemnity unless its own conduct is "sufficient to preclude indemnity." Weyerhaeuser Steamship Company v. Nacirema Operating Company, 1958, 355 U.S. 563, 567, 78 S.Ct. 438, 441, 2 L.Ed.2d 491. To determine whether the shipowner has engaged in conduct sufficient to preclude indemnity, the conduct in question must be weighed against the contractor's breach of warranty under contract principles. Waterman Steamship Corporation v. David, 5th Cir. 1966, 353 F.2d 660. If the shipowner did not "prevent or seriously handicap the stevedore in his ability to do a workmanlike job," then its conduct will not preclude indemnity. Albanese v. N. V. Nederl. Amerik Stoomv., 2nd Cir. 1965, 346 F.2d 481. Negligence on the shipowner's part is not necessarily fatal to its claim for indemnity. Weyerhaeuser Steamship Company v. Nacirema Operating Company, supra; see Italia Societa v. Oregon Stevedoring Company, supra, 376 U.S. at 320, 84 S.Ct. at 751. In summary, "[t]he determination of whether contractual indemnity should be allowed involves a weighing process evaluating the conduct of both parties to determine (1) whether the WWLP [warranty of workmanlike performance] was breached; (2) whether that breach proximately caused the injury; and (3) whether the shipowner's conduct prevented the workmanlike performance." Garner v. Cities Service Tankers Corp., 5th Cir. 1972, 456 F.2d 476, 481.
 
 
 11
 This Court has previously recognized the "equitable spirit behind the Ryan doctrine." Whisenant v. Brewster-Bartle Offshore Company, supra, at 400 of 446 F.2d. Its purpose is generally to place "the burden ultimately on the company whose default caused the injury." Italia Societa v. Oregon Stevedoring Company, supra, 376 U.S. at 324, 84 S.Ct. at 754. The Ryan doctrine is not, however, a precision instrument for allocating the burden according to the relative amounts of fault, but a rough allor-nothing device. Even where the shipowner and the contractor are both at fault, under the Ryan warranty doctrine indemnity will be allowed wholly or not at all, as the trier of fact may determine by weighing the conduct of the two parties as described above. See Garner v. Cities Service Tankers Corp., supra, at 480 n. 6 of 456 F.2d; G. Gilmore & C. Black, The Law of Admiralty, Sec. 6-57 at 373 (1957).
 
 
 12
 In attacking the district court's conclusion that an indemnitor-indemnitee relationship existed between Yo-Ro and Jahncke under the Ryan doctrine, appellants make three arguments. First, with regard to the breach of warranty issue, eschewing any contention that fuel oil may not be an unseaworthy condition or that a maritime contractor's failure to stop work or eliminate the hazard may be a breach of the contractor's warranty of workmanlike performance,[5] they attack the district court's findings of underlying facts. Specifically, appellants argue that the record shows that no oil accumulated on the catwalk where Parfait was working, so that failure to eliminate the nonexistent hazard could not have been a breach of Yo-Ro's warranty of workmanlike performance. They urge that the oil upon which Parfait slipped came from a barrel on the upper deck in which Jahncke employees were cleaning engine parts. This attack must founder on the "clearly erroneous" rule. Fed.R. Civ.P. 52(a); McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20. It is true that Parfait's testimony, which was the principal evidentiary source of the district court's findings, was impeached at trial by the introduction of prior inconsistent statements given at depositions and that it was inconsistent in some particulars with the testimony of other witnesses. We note, however, that at least two other witnesses' testimony tended to corroborate that the fuel oil on the upper deck was clear of Parfait's path at the time of the fall. The district court carefully considered this factual question and specifically rejected appellants' version of the facts in favor of plaintiff's version. On the record before us we cannot say this finding was clearly erroneous. Secondly, with regard to the causation issue, appellants make a related factual argument that even if Yo-Ro breached its Ryan warranty by failing to clean up oil on the catwalk, this breach was not the cause of Parfait's fall, since he slipped on oil from the upper deck. Again, we cannot hold the district court's contrary finding clearly erroneous.
 
 
 13
 Thirdly, appellants advance a fundamentally misconceived argument that Jahncke can have no right of indemnity against Yo-Ro because Jahncke was actively negligent and Yo-Ro was at most passively or secondarily negligent. "Indemnity may arise either in contract or in tort." General Electric Company v. Cuban American Nickel Company, 5th Cir. 1968, 396 F.2d 89, 90. The two types of indemnity rights rest on separate and distinct theoretical bases and require proof and evaluation of different elements. See, e. g., Halliburton Company v. Norton Drilling Company, 5th Cir. 1962, 302 F.2d 431, reh. denied 1963, 313 F.2d 380, cert. denied 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052; American President Lines, Ltd. v. Marine Terminals Corporation, 9th Cir. 1956, 234 F.2d 753, cert. denied 352 U.S. 926, 77 S.Ct. 222, 1 L.Ed.2d 161. As between two joint tort-feasors, the passively negligent party may recover indemnity from the actively negligent party. This type of indemnity was explored in depth in Tri-State Oil Tool Industries, Inc. v. Delta Marine Drilling Company, 5th Cir. 1969, 410 F.2d 178. See also Magnum Marine v. Kenosha Auto Transport Corporation, 5th Cir. 1973, 481 F.2d 933. Although principles of equity underlie both this tort indemnity doctrine and the Ryan doctrine, indemnity under the latter does not rest on the tort concepts implicit in the former, but on a contractual warranty theory. Ryan Stevedoring Company v. Pan-Atlantic Steamship Corporation, supra, 350 U.S. at 133, 76 S.Ct. at 237. If the Ryan case itself left any doubt as to the distinctly contractual nature of the warranty doctrine it established, that doubt was removed in the final paragraph of Weyerhaeuser Steamship Company v. Nacirema Operating Company, supra, 355 U.S. at 569, 78 S.Ct. at 442, where the Court pointed out "that in the area of contractual indemnity an application of the theories of 'active' or 'passive' as well as 'primary' or 'secondary' negligence is inappropriate." Thus, appellants' active-or-passive negligence argument is made in the wrong case; it does not touch on the pivotal issues of the Ryan doctrine, upon which the district court relied in determining that an indemnitor-indemnitee relationship existed in this case.
 
 
 14
 Construing appellants' activenegligence argument as a challenge to the district court's determination that the shipowner's conduct was not sufficient to preclude indemnity, we find it without merit. We agree with the district court that "any fault by Jahncke and unseaworthiness created thereby, would not have prevented Yo-Ro from performing its operations in a workmanlike manner." 347 F.Supp. at 490.
 
 
 15
 Being unpersuaded by appellants' assaults on the district court's determination that an indemnitor-indemnitee relationship existed between Yo-Ro and Jahncke, we proceed to the second major part of appellants' attack on the district court's order of indemnity. The district court held that in order to exercise its right of indemnity against Yo-Ro for the amount of the settlement, Jahncke was required to show only potential liability, not actual liability to Parfait, and that the amount of the settlement was reasonable. And it found that Jahncke made the required showings. Appellants argue that Jahncke was required to show actual liability to Parfait and that the amount of the settlement was not reasonable.
 
 
 16
 The actual-versus-potential liability problem is unique to cases in which the original defendant (indemnitee) has settled with the original plaintiff without giving the third-party defendant (indemnitor) an opportunity to approve the amount of the settlement or to conduct the defense, and in which traditional indemnity principles are not modified by express contract between the parties. To be distinguished are "cases in which (1) the original defendant's claim for indemnification was founded on a judgment, or (2) the indemnitor was tendered the defense and refused it, or (3) the indemnitee's claim against the indemnitor was founded upon a written contract." Whisenant v. Brewster-Bartle Offshore Company, 5th Cir. 1971, 446 F.2d 394, 401-402; see Tankrederiet Gefion A/S v. Hyman-Michaels Company, 6th Cir. 1969, 406 F.2d 1039, 1042. In settlement cases such as the instant one, the indemnitee has the special problem of showing that his disposition of the indemnitor's funds has not contravened equitable indemnity principles.
 
 
 17
 Such principles require at a minimum that the indemnitee demonstrate his potential liability to the original plaintiff. Smith v. Brown & Root Marine Operators, Inc., W.D.La.1965, 243 F.Supp. 130, aff'd per curiam sub nom. Underwater Services, Inc. v. Brown & Root Marine Operators, Inc., 5th Cir. 1967, 376 F.2d 852.[6] This Court has recognized that under some circumstances, when the original claim has been settled, a showing of actual liability may be required to support the indemnity claim. Whisenant v. Brewster-Bartle Offshore Company, supra at 401-403 of 446 F.2d. We have approved the view of the Fourth Circuit expressed in Jennings v. United States, 4th Cir. 1967, 374 F.2d 983, 986 that:
 
 
 18
 The indemnitee's unilateral acts, albeit reasonable and undertaken in good faith, cannot bind the indemnitor; notice and an opportunity to defend are the indispensable due process satisfying elements.
 
 
 19
 See Whisenant v. Brewster-Bartle Offshore Company, supra at 403 of 446 F. 2d. This Circuit has not, however, unreservedly adopted the "general rule" of the Sixth Circuit "that an indemnitee must show actual liability to recover against an indemnitor." Tankrederiet Gefion A/S v. Hyman-Michaels Company, 6th Cir. 1969, 406 F.2d 1039, 1042.
 
 
 20
 In this case we do not find any circumstances present which, in fairness to the indemnitor, call for proof of actual liability.[7] A practical device by which an indemnitee can protect himself against the awkward possibility of having to prove the original plaintiff's case against himself, the original defendant, is to offer the indemnitor before any settlement is concluded the choice of (1) approving the settlement or (2) taking over the defense of the case and agreeing to hold the indemnitee harmless in any event for damages which may be assessed against him in excess of the amount of the proposed settlement. See Tankrederiet Gefion A/S v. Hyman-Michaels Company, supra at 1043-1044 of 406 F.2d. If the indemnitor approves the settlement or defends unsuccessfully against the original claim, he cannot later question the indemnitee's liability to the original claimant. If the indemnitor declines to take either course, then the indemnitee will only be required to show potential liability to the original plaintiff in order to support his claim over against the indemnitor. Although the record in this case does not conclusively show that Jahncke formally made to Yo-Ro the type of pre-settlement offer[8] described in Tankrederiet Gefion A/S v. Hyman-Michaels Company, supra, it does show that Yo-Ro was afforded substantially the same protection as if the Tankrederiet Gefion procedure had been followed. Yo-Ro was continuously informed of the settlement negotiations in progress and was offered and declined defense of the original action. The only variation from the Tankrederiet Gefion procedure was the apparent failure of Jahncke to tender the final settlement offer to Yo-Ro for approval. In view of Yo-Ro's awareness of the progress of the negotiations and its failure to object to settlement on the terms contemplated, we do not view this omission as serious in the circumstances of this case. Yo-Ro had a clear opportunity to challenge the Jahncke-Parfait liability to protect its own interest as an indemnitor, yet it declined to do so. Under the circumstances, we conclude that only a showing of potential liability was necessary. The finding of potential liability is strongly supported by the record.
 
 
 21
 The Whisenant case, in which a showing of actual liability was required, is distinguishable. There the original negligence theory on which the original plaintiff had proceeded appeared questionable as a basis for liability, and the indemnitee had attempted to justify the settlement by amending its pleadings to introduce a new unseaworthiness theory. Further, the indemnitor in that case had no real opportunity to contest the original claim, and the record indicated that, given the chance, he would have chosen to do so. None of these circumstances, nor any others suggesting unfairness to the indemnitor, are present in the instant case.
 
 
 22
 In addition to potential liability, Jahncke had the burden of showing that the settlement was reasonable in amount. Appellants urge that the amount of the settlement was excessive because if the claim had been tried, contributory negligence of the plaintiff would have diminished the amount of his recovery by a fraction approaching one hundred percent. We cannot say, however, that the contrary finding of the district court was clearly erroneous.
 
 
 23
 Thus, we conclude that the district court properly held an indemnitor-indemnitee relationship existed between Yo-Ro and Jahncke by virtue of the Ryan doctrine and that Jahncke, having shown potential liability and the reasonableness of the amount of its settlement with Parfait, was entitled to indemnification from Yo-Ro.
 
 
 24
 II. Coverage Under the Policy of Travelers Indemnity Company
 
 
 25
 It was stipulated at trial that Yo-Ro offered its insurers an opportunity to defend in accordance with its contractual obligations and that each insurer denied coverage. Whether the insurance companies must pay Yo-Ro's damages depends wholly on whether the loss is covered under their respective policies.
 
 
 26
 The pertinent insuring language in the Travelers $100,000 "Commercial Automobile-General Liability Policy" reads:
 
 
 27
 The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
 
 
 28
 Coverage A. Bodily injury.
 
 
 29
 Coverage B. Property damage.
 
 
 30
 to which this insurance applies . . . . [emphasis in original.]
 
 
 31
 As defined in the policy, "bodily injury" means "bodily injury, sickness or disease sustained by any person," and "property damage" means "injury to or destruction of tangible property." Travelers contends that two exclusionary paragraphs preclude coverage for Yo-Ro's loss. The first is exclusion (d), also called the "watercraft exclusion." We do not deal with this exclusion, since we agree with Travelers that the second one, exclusion (h), makes plain that the policy does not cover the type of loss involved in this case.
 
 The exclusionary provision reads:
 This insurance does not apply to:
 
 32
 (h) bodily injury to any employee of the insured arising out of and in the course of the employment by the insured; but this exclusion does not apply to liability assumed by the insured under an incidental contract. [emphasis in original.]
 
 
 33
 The parties agree that Parfait was Yo-Ro's employee, that he was injured in the course of his employment, and that no "incidental contract," as that term is defined in the policy, existed between Yo-Ro and Jahncke. Thus, the exclusion would appear to defeat coverage in this case. Yo-Ro's argument in favor of coverage is that the exclusion applies only to liability resulting from an action by the injured employee directly against the employer, and not to an obligation to indemnify a third party which has been found primarily liable to compensate an injured employee of the insured.
 
 
 34
 We agree with Yo-Ro that the insuring language in the policy, which speaks broadly of "all sums" which the insured shall become obligated to pay as damages "because of" bodily injury, is broad enough to cover both (1) liability directly to an injury victim and (2) liability to indemnify a third party which is based ultimately on bodily injury, but we cannot agree that exclusion (h) applies only to the former type of liability. The insuring language covers only liability-whether direct or indirect via indemnity under the Ryan doctrine-for bodily injury "to which this insurance applies." Exclusion (h) provides expressly that the insurance does not apply to injury to the insured's employees in the course of their employment. The employee status of the injury victim is made the key to the exclusion, not the procedural route by which the liability comes to rest on the insured. Bodily injury coverage of the policy extends only to non-employees. We do not find such an exclusion anomalous in Travelers' "Commercial Automobile-General Liability Policy," for employee injuries have long been treated as a special kind of risk and covered under special policies.
 
 
 35
 Exclusion (a) is not inconsistent with exclusion (h) and does not change our conclusion. Under exclusion (a) the insurance does not apply:
 
 
 36
 (a) to liability assumed by the insured under any contract or agreement except an incidental contract; but with respect to bodily injury or property damage occurring while work performed by the named insured is in progress, this exclusion does not apply to a warranty that such work will be done in a workmanlike manner. [emphasis in original.]
 
 
 37
 In exempting from its sweep warranty liability under the Ryan doctrine, exclusion (a) is consistent with our broad reading of the insuring language. Exclusion (a) is limited by exclusion (h), but the two are not inconsistent, since liability arising from injury to a nonemployee might be imposed under the Ryan doctrine.[9]
 
 
 38
 Indemnity Insurance Company v. California Stevedore & Ballast Company, 9th Cir. 1962, 307 F.2d 513, upon which Yo-Ro relies, is not apposite, since the policy language in that case was significantly different from the language in question in this case. The applicability of Larson Construction Company v. Oregon Automobile Insurance Company, 9th Cir. 1971, 450 F.2d 1193, is doubtful because only brief fragments of the insuring and exclusionary language are quoted in that opinion.
 
 
 39
 We are, of course, aware of the rule that ambiguities in an insurance policy must be construed against the insurer, but we can discover no ambiguities or inconsistencies in the Travelers policy as applied to the facts of this case. The plain language of the policy shows that it does not cover liability originating in injuries to the insured's employees. Accordingly, we must reverse that portion of the district court's judgment holding that the Travelers policy covered Yo-Ro's obligation to indemnify Jahncke.
 
 
 40
 III. Coverage Under the Policy of Home Indemnity Company
 
 
 41
 In its "Standard Workmen's Compensation and Employers' Liability Policy" Home agreed:
 
 
 42
 1. Coverage A-Workmen's Compensation: To pay promptly when due all compensation and other benefits required of the insured by the workmen's compensation law.
 
 
 43
 2. Coverage B-Employers' Liability: To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury by accident or disease, including death at any time resulting therefrom, sustained . . . by any employee of the insured arising out of and in the course of his employment by the insured . . . .
 
 
 44
 The policy limit of liability is $25,000. As was true of the Travelers policy, the insuring language in the Home policy is broad enough to cover both direct liability to the injury victim and indirect liability under the Ryan doctrine on account of bodily injury. This breadth of coverage is made explicit in condition 9 of the policy:
 
 
 45
 The words "damages because of bodily injury by accident or disease, including death at any time resulting therefrom," in coverage B include damages for care and loss of services and damages for which the insured is liable by reason of suits or claims brought against the insured by others to recover the damages obtained from such others because of such bodily injury sustained by employees of the insured arising out of and in the course of their employment.
 
 
 46
 Consistently, exclusion (c), relating to liability assumed by the insured under a contract, expressly exempts from its scope liability to indemnify under the Ryan doctrine. Unlike the Travelers policy, the Home policy is aimed specifically at liability resulting from employees' injuries.
 
 
 47
 In denying coverage, Home relies on the "Exclusion of Maritime Liability Endorsement," which reads:
 
 
 48
 It is agreed that the policy does not apply to injury, including death resulting therefrom, sustained by a master or a member of the crew of any vessel or by any person in the course of an employment subject to the United States Longshoremen's and Harbor Workers' Compensation Act, U.S.Code (1946) Title 33, Sections 901-949.
 
 
 49
 Home argues that this exclusion excludes both direct liability to employees covered by the Longshoremen's and Harbor Workers' Act and Ryan warranty liability originating in injuries to such employees.
 
 
 50
 As we read the maritime exclusion, however, it is somewhat narrower than the insuring language and may be read as excluding only direct liability to an employee covered by the Longshoremen's and Harbor Workers' Act. The words "the policy does not apply to injury" are ambiguous as applied to liability under the Ryan doctrine, which arises not directly from the injury, but from breach of a warranty obligation. The exclusion may reasonably be read as only a counterpart of Coverage A, providing Workmen's Compensation coverage-as an exclusion of coverage for liability directly to the employees for maritime injuries, either under the Act or apart from it- and not as an exclusion of Ryan indemnity liability. We conclude that, in view of the clear thrust of those portions of the policy providing coverage both for direct liability to employees and for indemnity liability originating from employees' injuries and in view of the uncertain application of the maritime exclusion to indemnity liability, the policy must be construed as providing coverage for indemnity liability originating from an employee's maritime injuries. If an exclusion is to take away what the insuring language provides, it must do so in unmistakably clear terms. Accordingly, we hold the Home policy does cover Yo-Ro's liability to Jahncke within its liability limits.
 
 
 51
 The judgment of the district court is affirmed in part and reversed in part. Costs are taxed equally against Yo-Ro and Home.
 
 ON PETITION FOR REHEARING
 PER CURIAM:
 
 52
 It is ordered that the petition for rehearing filed on behalf of Home Indemnity Company, Appellee in the above entitled and numbered cause be and the same is hereby denied.
 
 ON PETITION FOR REHEARING
 PER CURIAM:
 
 53
 In its petition for rehearing, Yo-Ro Diesel Service, Inc. raises four points. The first three concern the reasonableness of its opportunity to defend, the fact finding that there was oil on the catwalk, and the construction of the exclusionary clause in the Travelers insurance policy. We think our original opinion adequately disposes of these issues.
 
 
 54
 Point four of the petition, however, raises the issue of costs of the defense, including attorney's fees. The district court had awarded these costs against Travelers and allowed the parties sixty days from the date of the judgment to agree on their amount. In the absence of an agreement, any party was invited to apply to that court for a hearing to determine the amount. We have reversed as to the liability of Travelers and as to the nonliability of Home, but we have not dealt with the issue of the costs as a matter of contractual liability under the policies.
 
 
 55
 Both the Home and the Travelers policies contain clauses obligating the insurers to bear the costs of defense to suits on claims covered by the policies. It is probable that both insurers are therefore liable for the costs of this suit, including attorney's fees, even though only Home has been held liable for the basic claim, since there was a reasonable possibility that each policy might have covered this claim. See J. Appleman, Insurance Law and Practice, Sec. 4683 (1962). Although this issue has been raised by Yo-Ro in its brief, neither Home nor Travelers has argued it. We could, of course, grant the petition for rehearing on this point, hear further argument on it, and remand to the district court for a determination of the amount of any defense costs we determined might be allowable. In the interests of judicial economy, however, we feel that the most expeditious way to handle this whole issue is to remand to the district court for a hearing on both the existence of liability for costs on the part of either Home or Travelers or both and the amount of those costs.
 
 
 56
 The petition for rehearing is DENIED and the case is REMANDED for a hearing on these issues.
 
 
 
 [1]
 Ryan Stevedoring Company v. Pan-Atlantic Steamship Corporation, 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133
 
 
 [2]
 The January 14, 1972, letter from counsel for Yo-Ro to counsel for Jahncke, for Home, and for Travelers read:
 Reference is made to a letter offer by Mr. Samuel Gainsburgh, co-counsel for the plaintiff, Wilson Parfait, wherein he indicated he would settle the pending lawsuit for the sum of $90,000.00. Obviously, this figure would be within the policy limits. Further, it would be to the best interest and advantage of the assured to have this lawsuit settled for any sum beneath the maximum amount of the general liability policy in the amount of $100,000.00.
 As attorney for Yoro Diesel Service, Inc., I respectfully request that the insurers settle this lawsuit to avoid exposure by Yoro of amounts in excess of the policy limit and because of the various facts and circumstances which directly affect the economic interests of Yoro. Accordingly, it is submitted that it would be to the best interest of the assured to have this lawsuit settled and I call upon you to immediately effect a settlement of the pending lawsuit, with full reservation of the attorney's fees for Yoro, and I reiterate that in the event a settlement is not consummated immediately, there is a continuing duty on your behalf to defend this matter. I re-urge your obligations under the policy and request compliance therewith, and re-assert our claim for reasonable attorney's fees.
 This letter could reasonably be read as a request to Jahncke to settle for any amount under $100,000. In a letter to Yo-Ro dated January 20, 1972, counsel for Yo-Ro "explained" that the request for settlement in the January 14 letter was directed only to the insurers, and not to Jahncke. Since we cannot ascertain with confidence from the record a clear intent on Yo-Ro's part to approve the Jahncke-Parfait settlement and since the district court made no finding on this issue, we accord Yo-Ro the benefit of the doubt and treat the January 14 letter as a request for settlement directed to the insurers only. See note 8, infra.
 
 
 [3]
 The full text of the January 20, 1972, letter from counsel for Jahncke to counsel for Yo-Ro read:
 I have a copy of your letter of January 14, 1972, to counsel for your clients' insurers and I note that you consider that settlement in the amount of $90,000.00 would be desirable.
 As I told you over the telephone yesterday, I have been talking to Sam Gainsburgh in an attempt to work out a compromise agreement and if the opportunity presents itself in which we think that settlement can be made on an attractive basis, we will settle the principle [sic] claim and proceed against your client for indemnity.
 I invite you again to come in and defend Jahncke Service, Inc. in this matter and satisfy us that your client will hold it harmless and fully indemnify it for any adverse judgment in the premises. If I do not have your immediate acceptance of this offer, I will proceed with settlement along the above lines, if a reasonable opportunity presents itself to settle the case at a reasonable figure.
 See note 8, infra.
 
 
 [4]
 We note that the Ryan doctrine was abrogated by the 1972 amendments to the Longshoremen's and Harbor Workers' Act, 33 U.S.C.A. Sec. 901 et seq. See 33 U.S.C.A. Sec. 905(b). Of course, the amendments do not affect this action which arose and was tried long before they became effective
 
 
 [5]
 Such an argument is foreclosed, as the district court observed, by Burrage v. Flota Mercante Grancolombiana, 5th Cir. 1970, 431 F.2d 1229
 
 
 [6]
 See also Jennings v. United States, 4th Cir. 1967, 374 F.2d 983; American Export Lines v. Norfolk Shipbuilding & Drydock Corporation, 4th Cir. 1964, 336 F.2d 525; Damanti v. A/S Inger, 2d Cir. 1963, 314 F.2d 395, 397, cert. denied sub nom. Daniels & Kennedy, Inc. v. A/S Inger, 375 U.S. 834, 84 S.Ct. 46, 11 L.Ed.2d 64; Paliaga v. Luckenbach Steamship Company, 2d Cir. 1962, 301 F.2d 403; California Stevedore & Ballast Company v. Pan-Atlantic Steamship Corporation, 9th Cir. 1961, 291 F.2d 252
 
 
 [7]
 The district court determined only that Jahncke demonstrated its potential liability to Parfait, but the court's finding that the accumulated oil on the catwalk beside the engine constituted an unseaworthy condition which was a proximate cause of the accident closely approaches a determination that Jahncke's actual liability was established. Because the district court did not rule in the first instant on Parfait's status as a Sieracki seaman or on the extent of his contributory negligence, if any, however, we do not treat the district court's finding of unseaworthiness which proximately caused the accident as a conclusive finding of factual liability. See Jackson v. Lykes Brothers Steamship Company, 1967, 386 U.S. 731, 734, 87 S.Ct. 1419, 1421 n. 4, 18 L.Ed.2d 488; Seas Shipping Company v. Sieracki, 1946, 328 U.S. 85, 94, 66 S.Ct. 872, 877 n. 11, 90 L.Ed. 1099; Whisenant v. Brewster-Bartle Offshore Company, 5th Cir. 1971, 446 F.2d 394, 403 n. 31
 
 
 [8]
 The letter quoted in note 3, supra, appears to be such a presettlement offer, but it may not have arrived before the settlement was concluded. The letter is dated January 20, 1972, a maximum of three days before the settlement, which was concluded at an undisclosed time before trial began on Monday, January 24, 1972
 But for the January 20, 1972 letter from Yo-Ro to Jahncke (whose arrival time in relation to the time of the settlement is also unknown to us) which "explained" the earlier January 14 letter from Yo-Ro to Jahncke, see note 2, supra, we would construe the January 14 letter as an effective approval of any settlement under $100,000 that Jahncke might make with Parfait, estopping Yo-Ro from questioning the Jahncke-Parfait liability and rendering a formal Tankrederiet Gefion offer unnecessary.
 
 
 [9]
 After explaining the contractual nature of the Ryan warranty of workmanlike performance, under which the shipowner may recover from the stevedore the amount of damages the shipowner has paid on account of injuries to the stevedore's employee, the Supreme Court explained:
 And a like liability for breach of contract accrues to a shipowner against a stevedoring contractor in any instance when the latter's improper storage of cargo causes an injury on shipboard to someone other than one of its employees. The coincidence that the loading contractor here happens to be the employer of the injured longshoreman makes no difference in principle.
 Ryan Stevedoring Company v. Pan-Atlantic Steamship Corporation, 1956, 350 U.S. 124, 130-131, 76 S.Ct. 232, 236, 100 L.Ed. 133.